HARLEM CHURCH OF SEVENTH DAY ADVENTISTS, Plaintiff, *v.* GREATER NEW YORK CORPORATION OF SEVENTH DAY ADVENTISTS and GREATER NEW YORK CONFERENCE OF SEVENTH DAY ADVENTISTS, Defendants.

Supreme Court, New York County, July 1, 1932.

*Nathan Lieberman*, for the plaintiff.

*Jay Noble Emley*, for the defendants.

McCook, J. This is an action for specific performance of an alleged agreement made about the year 1915 between the parties. The plaintiff prays that certain church premises situated at Nos. 144–146 West One Hundred and Thirty-first street be impressed with a trust and a lien and that the defendants be enjoined from interfering with the plaintiff's possession. The answer denies the creation of any trust and raises a question as to the identity of the plaintiff.

During the summer of 1910 one James K. Humphrey, an ordained minister of defendant denomination, was active in organizing colored persons for religious purposes under the supervision of the Seventh Day Adventists. He conducted large and successful meetings in a tent and collected money. On October 10, 1910, Mr. Humphrey contracted to purchase church premises at No. 184 West One Hundred and Thirty-fifth street. He took title to the One Hundred and Thirty-fifth street church in his own name within a few days. On February 8, 1911, a certificate of incorporation of the Harlem Church of Seventh Day Adventists (which occupied the One Hundred and Thirty-fifth street church) was filed in the office of the county clerk of New York county. Five months later a deed was executed by Humphrey to the Harlem Church of Seventh Day Adventists and recorded on July 24, 1911.

The next day a certificate of incorporation of the defendant Greater New York Corporation of Seventh Day Adventists was filed. These premises continued to be occupied by the Harlem Seventh Day Adventist Church and were used for the customary church purposes. Various contributions were made from 1911 to 1915 by the plaintiff congregation to the denomination at large. A petition was filed on December 29, 1915, for leave to convey the premises to the defendant Greater New York Corporation of Seventh Day Adventists, and a deed was recorded on January 8, 1916, after the entry of an appropriate court order. About six months later another church was bought by the defendant corporation on One Hundred and Thirty-first street because it was found that the One Hundred and Thirty-fifth street building was no longer suited to the purposes of the congregation. The One Hundred and Thirty-fifth street premises were afterwards sold. Mr. Humphrey throughout these and the next twelve years acted as the minister of the congregation at both locations, and also represented it in the conference. Under his leadership it increased in numbers and contributions.

Prior to 1929 we have no evidence of serious disagreement. In that year Humphrey and the elders of the defendant conference met to discuss their relations. The defendant conference had indicated its displeasure with respect to certain real estate ventures in New Jersey, aiming towards a religious and social center for colored people, which Humphrey had undertaken without the advice of the conference elders. Considering these acts an encroachment upon their authority, and otherwise improper, the conference requested Humphrey to desist. He refused and was supported in his refusal by the great majority of the members of the congregation. In August, 1929, Mr. Humphrey ceased to act as minister of the defendant to the congregation, which claimed that he had been wrongfully suspended. The defendant conference maintains that he left the fold and was, therefore, properly unfrocked, and that by supporting him in his " rebellion " the congregation " seceded " from the denomination. The following month the contributions of the congregation to the denomination were discontinued, and on November 2, 1929, its other relations with the defendant conference were terminated. A mandamus instituted to reinstate Humphrey was denied on December 5, 1929, and an injunction restraining the defendants from evicting the plaintiff congregation was granted on July 16, 1930.

At the outset I can do no better than repeat the words of SAND-FORD, Assistant Vice-Chancellor, taken from his very able and exhaustive opinion in the leading case of *Kniskern* v. *Lutheran*

*Churches of St. John's and St. Peter's* (1 Sandf. 439, 499 [1844]): " Before entering upon the points of difference between the parties in this unhappy controversy, I will state briefly the history of the churches in question and advert to the principles on which courts of equity exercise their jurisdiction in such cases." *First.* The Adventists are a Protestant sect which had its beginnings in or about the year 1844. Their basic tenet is a belief in the near personal return of Christ. The Seventh Day Adventists add as fundamental doctrines the observance of the seventh day of the week as the Sabbath, the communicability of the prophetic gift at the present day, the duty of paying tithes and the prohibition against alcoholic liquors, tobacco and narcotics, etc. In 1926 there were in the United States 2,576 Adventists churches with a membership of 146,177, and in New York city sixteen churches of Seventh Day Adventists with a membership of 2,601. Compared to certain leading religious orders of the world this denomination is small, and its teachings and doctrines are not a matter of general knowledge. It becomes necessary, therefore, to look as far as available " to the written declarations in the constitution, by-laws, and written documents of the organization to ascertain the trust and the purpose for which the property was conveyed." (*Fuchs* v. *Meisel,* 102 Mich. 357, 369.)

*Second.* In some respects church organizations are similar to business organizations; in others they are governed by unique laws. " Religious corporations are governed by the same general rules of law and equity as other corporations. The presumptions of fact applicable to religious corporations are not in all cases the same as the presumptions of fact applicable to other corporations." (*Wilson* v. *Tabernacle Baptist Church,* 28 Misc. 268, 269.) A church organization possesses a dual nature, being at once a congregation *and* an incorporated or unincorporated body, with a spiritual or ecclesiastical and a temporal side. In its temporal aspect it holds title to property and functions as any other secular body would, whether incorporated or unincorporated. In its other aspect it is *sui generis,* and the laws which govern it are the regulations of its denomination or organization or its own tenets. The courts at no time assume to dictate or to interpret ecclesiastical doctrine, and such matters, whether discretionary or mandatory, are left to the ecclesiastical bodies. The court will not review the exercise of any discretion on the part of a superior church nor inquire whether its judgment or that of a subordinate is justified by the truth of a case. It will only inquire whether the organization's officer or tribunal has the power to act, not whether he or it is acting rightly. This position, however, is reserved for

the eccesiastical side. In its other aspect, the temporal, the court will intervene and will examine both the denomination and the congregation. If incorporated it will be subjected to all the requirements of a business corporation. If unincorporated it will be treated like a voluntary business association. The plaintiff in this action is a religious corporation, the certificate of incorporation having been signed by J. K. Humphrey, Jesse P. Cluff, Frederick Matthews, William J. Turner, George W. Watson and John Mahoney, and dated December 7, 1910. Several of the incorporators testified at the trial of this action. The defendants maintain that the plaintiff corporation was not properly organized, and, therefore, it has no standing in court. The defendants have accepted a deed from the plaintiff and are estopped to attack its legality, since if the plaintiff was not a corporation the defendants have no title to the property in question. It was organized for the purpose of holding title to the physical property of the Harlem Seventh Day Adventist Church, just as the defendant Greater New York Corporation of Seventh Day Adventists was organized for the purpose of holding the temporalities of its ecclesiastical companion, the Greater New York Conference of Seventh Day Adventists. The Harlem Church of Seventh Day Adventists is the proper plaintiff.

*Third.* " I will next speak of the principles which govern courts of equity in cases of this kind. They proceed on the ground of *a trust;* and their aim is to ascertain its scope and objects and to enforce its proper and faithful administration. The jurisdiction is environed with greater difficulties than that over the ordinary private trusts which come under our review, by reason of the uncertainty which frequently prevails, as to the precise objects and intentions of the donor. The inquiry often arises after a great lapse of time, when no living witness can inform the conscience of the court, and when its search for truth must be made in history, and in the controversial writings of contemporaries of the donors. The course of the administration of the trust, and its alleged perversion, are also frequently shrouded in mystery and involved in the subtleties of polemics and theologians. Still the court is bound to exercise its control over these charitable funds, as well as over the less difficult class of private trusts." ( *Kniskern* v. *Lutheran Churches, etc., supra,* at p. 502.) Out of the voluminous evidence received during three weeks of trial, the following facts appear: Humphrey, an astute and able individual, served his colored church and his denomination for many years. His relations with its elders were (at least superficially) cordial until the very end. He was a member of the conference and attended its meetings, and all

the business of the congregation discussed at sessions of the defendant conference was within his knowledge. It now appears, however, that he had gradually become dissatisfied with what he regarded as white control. Without consulting the conference he embarked upon various real estate and financial schemes, in some respects questionable. As a result of these extra-denominational activities, his ties with the defendant conference became first strained and finally severed. A letter dated September 23, 1929, was sent by the congregation to the defendant corporation reciting that "At a regular business meeting of this church it was voted that demand be made upon you to deed over to the First Harlem Seventh Day Adventist Church the property at 144–46 West One Hundred and Thirty-first street, Borough of Manhattan." On September twenty-seventh a reply was mailed saying: " I feel sure though that our board will desire to deal justly in the matter and will not refuse to give consideration to the request. It will, however, be necessary for me to wait until I return to New York in order to confer with the trustees of the corporation. There are certain equities involved which will need some special study." On November eighth the Greater New York Conference of Seventh Day Adventists addressed to the congregation its final reply rejecting the demand of September twenty-third. These " certain equities," long recognized though now sought to be repudiated, are before the court, and the plaintiff seeks the return of the church at One Hundred and Thirty-first street. Serious objections are urged by the defendants. The first is that the title is legally in the defendant Greater New York Corporation. The deed stands in the name of the defendant corporation, and there is no document on record which would tend to explain or modify its terms. The evidence offered by the plaintiff falls short of establishing an express trust. It is not necessary, however, to establish an express trust, as a trust may arise by implication of law. In certain cases and circumstances the holder of the legal title will be directed by a court of equity to apply the beneficial use to another, and at times a court of equity will decree that a transfer of the legal title be made to the holder of the beneficial interest. The deed of the One Hundred and Thirty-fifth street property to the defendant corporation was executed pursuant to a petition by the plaintiff corporation to the Supreme Court for leave to convey " for a nominal consideration," and an order entered thereon. The papers in this proceeding were drawn by the attorney for defendant corporation. In this petition the following statement occurs: " It is proposed to convey the above described property to the Greater

New York Corporation of Seventh Day Adventists, a religious corporation, the parent organization of which your petitioner is a member, and which has heretofore assisted your petitioner financially and otherwise, and that the object in making the proposed transfer is to conform to the denominational form of having the title of church property vested in such parent organization rather than in local church corporations." This related to the legal title; these premises (and those of the One Hundred and Thirty-first street church) were at all times used by the congregation. The congregation maintains that it had the equitable title to the church property, the defendant corporation holding it " in trust." The meaning of the statement in the petition is apparent — the transaction was formal rather than substantial. The various congregations were requested to deed their property in order " to conform to the denominational form." The use and benefit continued in this congregation. The affidavit in support of the petition for leave to sell states: " Whereas, it is a policy of the Seventh Day Adventists to have title to all church property vested in such Greater New York Corporation of Seventh Day Adventists rather than in the local church corporations, and as it is desired to have this church corporation conform to such policy * * * now, therefore, be it resolved * * *."

It is necessary to consider not only the record title, but also the physical and spiritual relationship of the parties, and the manner in which the property was maintained. The court must determine whether the relationship is a confidential one and, if so, the natural and probable results flowing therefrom. Where, for example, a father and child, brother and sister, or husband and wife are involved, conclusions may be reached not necessarily to be found in other cases. Upon our trial the witnesses testified that the arrangements between the plaintiff and defendant were oral. The details leading up to the petition and the deed were not reduced to writing. The court may find that the parties entered into a written deed because of parol representations. (See *Sinclair* v. *Purdy*, 235 N. Y. 245, 250, 251.) " This woman had received a deed of her brother's interest in the land, for which she had paid nothing. She had received it because he wished to put the title in a form where his ownership would be secret. That appears from her own testimony upon an examination before trial. If from such a conveyance without more a trust did not arise, at least the situation was one in which the recognition of a trust became natural and probable. In Elvira's own words, Elijah trusted to her sense of honor. That is the background which gives to the figures in the foreground their position and perspective. We must read the letter in its setting. Thus viewed, its assertion of equality

of interest becomes something more than a tribute to brotherly affection. It is the recognition of a right and the declaration of a duty. * * * (p. 253). It was ' the case of a confidence induced, not by the bare promise of another, but by the promise and the confidential relation conjoined.' (*Wood* v. *Rabe*, 96 N. Y. 414, 426.) ' The absence of a formal writing grew out of that very confidence and trust, and was occasioned by it.' (*Goldsmith* v. *Goldsmith*, 145 N. Y. 313, 318.) In such conditions the rule in this State is settled that equity will grant relief. (*Wood* v. *Rabe, supra; Goldsmith* v. *Goldsmith, supra; Gallagher* v. *Gallagher*, 135 App. Div. 457; 202 N. Y. 572; *Allen* v. *Arkenburgh*, 2 App. Div. 458; 158 N. Y. 697.) Distinctions are, indeed, to be drawn between cases where property is parted with on the faith of an oral promise, and cases where one without an interest in property before obtains a promise that an interest will be given to him thereafter. (*Leary* v. *Corvin*, 181 N. Y. 222, 229; cf. *Amherst College* v. *Ritch*, 151 id. 282.) It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence which puts the court in motion " (p. 253). *Jeremiah* v. *Pitcher* (26 App. Div. 402; affd., 163 N. Y. 574) illustrates the principle to be applied. In that case a real estate dealer, having an insane wife, purchased property in the name of his daughter upon her promise to convey it as he might thereafter direct. She refused to follow his instructions and the action was brought. The court held (at p. 407): " The case at bar does not come within the Statute of Frauds; it is a parol agreement fully performed on the part of the plaintiff. He has paid the purchase price of this property, entered into possession, received the rentals and other incomes, paid the taxes, discharged the purchase money mortgages, making use of the property in his business as a dealer in real estate for the benefit of himself and family, relying upon the promise of his daughter to reconvey such property upon his order, and the defendant cannot now plead the Statute of Frauds to protect her in the ownership of this property."

The entire history of the dealings between our parties at and before the transfer was made shows that the congregation trusted in making it to the honor of their white brethren of the parent body. We now pass to the manner in which the property was administered and maintained. The congregation took care of repairs, upkeep, improvements, interest on mortgages, and amortization. Whatever was contributed on account of amortization by the conference was overwhelmingly offset by contributions from the congregation and its members to the denomination. It is immaterial whether the carrying payments were made by the plaintiff corporation or by the congregation for whose benefit the

corporation was created. The defendants claim that the court cannot consider the contributions (*i. e.*, the tithes, the mission funds, etc.) donated by the congregation and its members to the denomination on the ground that the plaintiff corporation and not the congregation held title to the property. If this contention is valid, it applies to the defendant as well as to the plaintiff. The defendant conference, as already pointed out, occupied a status similar to that of the plaintiff congregation. The defendant corporation held property which it applied for the use and benefit of the defendant conference. Without the defendant conference, the defendant corporation had no meaning. If the defendant corporation assisted in amortizing the mortgage upon the property, it was only by virtue of funds received from the defendant conference. The defendant conference in turn received funds from its constituent congregations, among them the Harlem Seventh Day Adventist Church. The Harlem church was the beneficiary of the plaintiff corporation, which was its trustee. The exhibits offered at the trial disclose that the congregation contributed to the denomination from 1920 to 1927 the amazing sum of $200,000, which included tithes, foreign missions and harvest gatherings. The fact that such large amounts were donated to the denomination further evidences the confidence reposed by the congregation in the conference and the corporation, and supports the view of the plaintiff that the corporation held the church property as a matter of form, with the real ownership in the plaintiff.

In *Chomkowitz* v. *Russian Greek Orthodox National Association* (219 App. Div. 592) the court said (at p. 593): " Legal title to the church is in the defendant. The contract to purchase it was made by the plaintiff. It was advised that for technical legal reasons it was inexpedient to take the record title in the name of an unincorporated association. There is evidence tending to show that its officers thereupon caused the defendant corporation to be formed. Immediately upon its formation and upon the acquisition of title to the property, it executed a grant to the plaintiff of ' the exclusive right ' to the property ' to be used as a church for the worship of God, and such other religious and social purposes as the ' plaintiff ' may see fit to use the same.' The plaintiff was obligated therein to pay not only all current expenses of upkeep and administration, including interest, taxes and janitor service, but also all installments of principal on mortgages and cost of repairs." The plaintiff at the Russian church trial offered to prove by various witnesses that the money which had been paid to the vendor of the church property was either that of the plaintiff or of the members of the plaintiff who contributed it for the benefit of the plaintiff. This evidence was rejected and the complaint was dismissed. The

Appellate Division in reversing the judgment and ordering a new trial said, by Proskauer, J.: "The evidence was relevant to support the plaintiff's contention that the defendant had but a naked legal title for plaintiff's benefit." Other considerations impel the court towards the recognition of an implied trust. The defendants in their bookkeeping are careful to record the rights of the churches in the various properties. These are denominated "equities of the churches" in the financial statements of the defendants. Plaintiff's Exhibit 55 states: "In 1925 our system of dealing with church property figures was changed. Formerly church property costs were set up in the books as an increase to surplus through the income account as shown on page 11, opposite 'Property Acquired,' under the years 1923 and 1924. In harmony with the recommendation of the General Conference of 1925, we charge off to surplus, $517,821.87, being the aggregate cost of the property acquired up to the year 1925. This amount represents the equity of the various churches, and is now in the account 'Equity of Churches in Land and Buildings,' as shown above, for the year 1925." Further evidence was introduced to show that the defendant corporation did not consider itself liable for insurance, taxes and repairs.

On page 172 of a publication by one Loughborough relating to defendant denomination and entitled "The Church and Its Organization" (plaintiff's Exhibit 59) appear the following question and answer: "Q. Is it proper to deed church buildings to a conference or general association? A. This has been done in many States. Thus doing, the church avoids the ofttime perplexing matter of getting a quorum of the members together annually to elect trustees. Let it be borne in mind, however, that such a deed is only ' in trust,' and that the corporation to whom it is deeded is not responsible for any expenses, such as repairs, insurance, taxes, etc. Some of our conferences have voted requesting the churches to deed their property to the corporation."

The funds used to purchase the One Hundred and Thirty-fifth street property and the One Hundred and Thirty-first street property were collected almost entirely by the plaintiff congregation and its colored constituents. The meaning of the statements in the exhibits is clear and unambiguous. The defendant corporation constituted itself the trustee for its membership churches, among them the Harlem Seventh Day Adventist Church, first called in defendants' books the "Harlem Church Property" and later the "Negro Church Property." (Cf. *Baptist Church in Hartford* v. *Witherell*, 3 Paige, 296, 304.)

I find that the defendant corporation held the property in trust for the use and benefit of the respective churches which deeded their

properties to it, including the Harlem Seventh 'Day Adventist Church. However, the defendants throughout the trial and in their briefs contend that even if the court should seek to decree a return of the property there is no proper beneficiary to whom such return can be made. The corporate plaintiff, they contend, was created for the sole purpose of acquiring title to the One Hundred and Thirty-fifth street church and has long been abandoned. Even if the corporate plaintiff and its trustees may today assert any right which they had at the time of the incorporation the defendants go further and say that, since the plaintiff corporation is in fact the temporal body of the congregation, the identity of the congregation must first be shown. The congregation has in the course of the years lost old members and acquired new ones; there have been changes in the officers, the trustees and the employees. Despite these differences in composition there exists a continuing identity. A congregation is the same if it continues essentially the policies and practices with which it has been identified. The entire component membership of a congregation may change, but it may remain the same if forms of worship and basic tenets are retained. Change of names does not necessarily mean loss of identity. On the other hand, mere retention of the name does not prove continuation of the identity. " Whether individuals and associations are stationary or itinerant, their identity is not preserved or lost by a continuance or a change of name." (*Holt* v. *Downs*, 58 N. H. 170, 179.) (See, also, *Venable* v. *Coffman*, 2 W. Va. 310.)

So far we have discussed the principles of equity without regard to statute. Plaintiff and defendants are, however, governed by the Religious Corporations Law. Section 5 of this law provides in part: " § 5. General powers and duties of trustees of religious corporations. The trustees of every religious corporation shall have the custody and control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same in accordance with the discipline, rules and usages of the corporation and of the ecclesiastical governing body, if any, to which the corporation is subject, and with the provisions of law relating thereto, for the support and maintenance of the corporation, * * * and they shall not use such property or revenues for any other purpose or divert the same from such uses. * * * But this section does not give to the trustees of an incorporated church, any control over the calling, settlement, dismissal or removal of its minister, or the fixing of his salary; or any power to fix or change the times, nature or order of the public or social worship of such church." It follows that the property under discussion can be used only " in accordance

with the discipline, rules and usages of the corporation and of the ecclesiastical governing body." Neither the plaintiff nor the defendant may divert its use to any other purpose. Before the enactment of this statute, churches might secede or withdraw and take their property with them. Subsequent to its enactment the congregation affiliated with a denomination, while it may, of course, join any other denomination or attempt to become independent, is no longer permitted to take its property along. The property remains subject to the denominational use. The effect of section 5 of the Religious Corporations Law was discussed in the case of *Westminster Church* v. *Presbytery of New York* (211 N. Y. 214). The Court of Appeals points out very clearly the difference between the legal and the spiritual entity of the church. With respect to the church as an ecclesiastical body, the courts have uniformly held that they will not interfere. (See *Walker* v. *Wainwright*, 16 Barb. 486; *Wallace* v. *Hughes*, 131 Ky. 445.) Even if a denomination should dissolve a church, the trustees of a corporation do not cease to be such by reason of the dissolution. " They still remained in law trustees of the real estate and were obligated at all events to care for that property pending a determination as to * * * future administration by other trustees, if others should thereafter be appointed or elected whose duty it would be to administer the property in accordance with denominational usage." (*Westminster Church* v. *Presbytery of N. Y., supra*, 225.) The contention of the defendant would be correct " if the statute permitted the dissolution of the *corporation* as distinguished from the dissolution of the *church*." (Id. 226.) As has already been pointed out, under the law it has no power to dissolve the *corporation*. But the plaintiff is not permitted to use the corporate property for itself as an independent organization. " Expressed in another form, defendants' claim is that they can utilize the church property of which they hold title for the maintenance and support of an ' independent ' Presbyterian church — a church free from and independent of any government or control of the church at large. On this theory practically the only limitation on the use of the property would be that it should not be devoted to the purposes of some other faith, as for instance, Methodist, Catholic, or Jewish. We do no accept this view." (*Trustees of Presbytery* v. *Westminster Church*, 222 N. Y. 305, 313.) " The meaning and effect of this language seem to be pretty plain * * *. There appears to be no doubt that under it a church which has become affiliated with and a constituent part of the church at large and as such has acquired property, would be compelled while this relationship continued to submit to the government of such church at large. Thus plainly says the statute. The only question which

would remain would be whether by rebellion or secession a constituent church can terminate the relationship and become free from such obligations and control and we think that this question quite answers itself. It cannot " (p. 315). The trustees of any religious corporation hold its property primarily for the congregation. " The body whose needs in the main are to be served and supported is the congregation which uses the property for worship and kindred religious or charitable purposes " (p. 317). It is not clear from the evidence, as I have previously said, whether the congregation seceded or was expelled. The controversy concerned discipline, not doctrine. It did appear at the trial that a new denomination had been organized under the title of the United Sabbath Day Adventists. Humphrey has become affiliated with this new denomination and the majority of the members of the congregation have joined him. The doctrines of the United Sabbath Day Adventists appear to be identical with those of the Seventh Day Adventists. This does not, however, entitle the congregation to a return of its property. " While they may be in theological belief and religious observances identical with the body from which they withdrew, they are ecclesiastically distinct." (*Schlichter* v. *Keiter*, 156 Penn. St. 119, 147.) (See, also *Matter of Lloyd's Memorial Congregational Church*, 178 N. Y. Supp. 104.) The One Hundred and Thirty-first Street Church may be held only for the use of a congregation affiliated with the denomination known as the Seventh Day Adventists.

The court has recognized throughout this case the fact that the plaintiff and the congregation are composed of colored persons, while the defendants are predominantly white. It has also taken notice of the fact that the use and benefit of a colored church may not be identical with the use and benefit of a white church. This is peculiarly true of the Seventh Day Adventist denomination, as one of its chief purposes is mission work among colored people. This does not mean that a religious order should make race or color a prerequisite for admission to its fold. Theoretically there appears to be no difference among the churches in fellowship with defendants. Practically the One Hundred and Thirty-fifth street property and the One Hundred and Thirty-first street property were always intended for colored persons. This was substantially stated in the petition for leave to convey to the defendant. The congregation and those who contributed to it expected that it would be used for the benefit of members of that race. The spirit and character of the original enterprise are indicated in a tract published May 6, 1911, by Mr. Humphrey, received upon the trial as defendants' Exhibit M. This pamphlet recites the tent campaign of the preceding summer and the purchase of the

property at No. 184 West One Hundred and Thirty-fifth street, and expresses the aspirations of the colored Seventh Day Adventists for the work in Harlem. No reader of this document can doubt the purpose to establish and maintain a center of religious activity among the members of that race within the Seventh Day Adventist denomination. (Cf. *Newman* v. *Proctor*, 73 Ky. 318, where a somewhat similar situation is discussed.) I hold that the defendants should be considered the trustees for the plaintiff corporation and that the plaintiff corporation is compelled to use the property in accordance with the " discipline, rules and usages " of the denomination. A decree will be entered directing a conveyance of the One Hundred and Thirty-first street church to the plaintiff corporation and further directing that the trustees or the officers of the plaintiff corporation proceed to administer the property for denominational purposes. Submit findings and decree accordingly.