S. S. & B. Live Poultry Corporation, Plaintiff, *v.* The Kashruth Association of Greater New York, Inc., Defendant.

Supreme Court, Special Term, New York County, January 27, 1936.

*Allan Deutsch,* for the plaintiff.

*Louis J. Gribetz* [*Lester Lyons* and *George Z. Medalie* of counsel], for the defendant.

McCook, J. A Bronx poultry dealer (business corporation), catering almost entirely to the orthodox Jewish[1] trade, claims in this action that it has been injured and is faced with ruin through the conduct of defendant (a membership corporation). The Kashruth Association of Greater New York, Inc., is accused, in effect, of conspiring with two other groups, not sued, to interfere with plaintiff's contractual rights by procuring religious edicts prohibiting the faithful from buying, and the plaintiff from selling, ritually slaughtered fowl without certain forms of supervision and means of identification not required by the Jewish law, notably the *plumba* or seal. The chief and most effective weapon specified as employed is a so-called *issur*[2] or prohibitory decree dated November 5, 1934, promulgated by one of the other two groups mentioned, namely, a large number of orthodox rabbis,[3] and supported on the business side by the second group, a union of *schochtim* or ritual

slaughterers, being Local 440. The relief asked against the defendant Kashruth Association, alone, is for rescission of a contract and an injunction with incidental damages.

The complaint has elsewhere been held sufficient (N. Y. L. J. July 17, 1935, p. 168) and we need not discuss in what category this action falls. Plaintiff has attempted to show that the requisite steps to the end sought were not taken; that a committee of twenty-three, also described as the *Beth Din* (court) or Little Sanhedrin, which first drafted and approved the *issur*, was improperly appointed and convened; that the orthodox rabbis of the community received inadequate notice, and that the *issur* itself was so informal, so improperly prepared for, adopted, promulgated and enforced, as to violate the law of the Jews applicable to such a matter. Obviously, therefore, the evidence received by this Supreme Court of the State of New York purporting to establish the facts upon which that question of Jewish law is predicated, and the point of law itself, should be the first subject of consideration.

In this connection it may be explained that while the orthodox Jews, like other Jews, recognize, accept and obey the laws of the country in which they reside, they consider it their religious duty at all times to settle their differences according to their own law.[4]

A brief description of the Jewish system of laws (the Torah) is necessary because of the many references to its various parts by witnesses and counsel. First in time came the five books of Moses, the Prophets and the Writings, three groups constituting what is known as the written law. Next, the *Mishna*, codifying and developing what preceded, until about year 250 of the Christian era. Then the so-called oral law, the *Gemarra* (Talmud), reduced to writing in approximately the year 500. The *Geonim* or Sages followed, with further amplifications, until about the twelfth century. From that date to the present the *Responsa* literature, namely, commentaries by recognized rabbis throughout the world, complete the chain. The law of the Jews is essentially racial, tribal or national. Since the government was a theocracy, from one point of view this whole legal system may be called religious. Speaking more exactly, it is divisible into two parts, one public and strictly religious, because concerning the relations between man and God, the other essentially private and secular, as controlling the relations between man and man.[5]

One of the oldest enactments, pronounced by Moses himself 3,400 years ago, relates to food. The dietary laws are mandatory in form, and traditionally regarded as a cornerstone of the faith. What may be eaten is denominated " kosher," an adjective whose corresponding noun is *kashruth*. From time immemorial[6] the religious duty of every orthodox Jew, and preeminently of the rabbi,

has been to obey, enforce and safeguard the principle of *kashruth*. Every detail originally mentioned has been repeatedly passed upon by commentators. Some of the specifications may seem strange to the Gentile observer, but on closer examination are found based upon either hygiene for the people or mercy for the humbler creatures.

Since the wholesomeness of an article of food is of obvious importance, its selection, inspection and preparation are to be closely scrutinized. Animals must be handled and killed only in a certain way and under rabbinic directory supervision. Ritual slaughtering or *schechita* is performed by a *schochet*. (The *issur* under examination relates to the slaughtering of poultry alone.) Since continuous attendance by any one rabbi at any one market is impossible, certain duties are delegated to subordinate supervisors. Each of these three, rabbi, *schochet* and supervisor, is regarded as filling a sacred office. By reason of the *issur* a new functionary, the *plumberer* or seal affixer has been designated, usually in the person of a supervisor.

The history of the case may be summarized by the following chronology, all in 1934:

July and August — A series of meetings in the City Hall and elsewhere, called at the request of a committee of fifty orthodox rabbis chosen by the mayor or the president of the board of aldermen, and attended by rabbis and laymen, *schochtim*, poultry men and commission merchants, discusses alleged abuses in the slaughter and sale of poultry, the economic situation of the participants, and the need of reform. The mayor appoints a lay mediator who holds conferences with different groups. The committee of fifty selects a committee of twelve on ways and means.

August 30 — The mediator reports with recommendations.

September 25 — Meeting of the so-called United Rabbinate, a loosely organized assembly of the rabbis of Greater New York, hears and discusses the mediator's report and adopts resolutions approving the principle of the *issur* and calling for the appointment of a *Beth Din* or court.

October 4 — The committee of twelve, after a meeting with the defendant's representatives, appoints a committee of three, which selects and notifies a *Beth Din* of twenty-three.

October 9 — First session of the *Beth Din* of twenty-three, which after discussion of the situation decides to prepare an *issur*.

October 20 — *Issur* drafted, submitted, discussed, revised and adopted by *Beth Din* of twenty-three.

October 22 — Meeting of market men and rabbis. *Issur* discussed but without agreement.

October 24 — Meeting of the Rabbinical Board of Greater New York, the largest local association of rabbis. *Issur* adopted by *Beth Din* of twenty-three approved.

October 29 — Meeting of the United Rabbinate of the City of New York, with a roll call of 219 recorded as present at the opening. The *issur* is read, discussed, voted upon and adopted.

November 5 — By general invitation and upon public announcement, the *issur* is promulgated in Norfolk Street Synagogue.

Later in November — The *schochtim* are called together and accept the *issur*.

Much criticism has been voiced of the notice given for these various occasions. Several means were adopted, including, notably, mailed letters, word of mouth and advertisement in the Jewish press. In particular the defendant proved full notice of the general meetings for rabbis of September twenty-fifth and October twenty-ninth, which marked, respectively, the official institution of proceedings looking to an *issur*, and their close in the adoption of the *issur* presented by the *Beth Din*. The combination of written notice and publication in newspapers with a circulation among those peculiarly interested of approximately 226,146, presumably read by three times that number of orthodox Jews, advised the religious community, including the rabbis, of an intention to take measures for the enactment of the form and kind of religious ordinance which was finally adopted. No interested party had an excuse for ignorance of what was going on. Applying criteria accepted in corresponding circumstances under our own law and rules, I find that adequate notice was given at each important stage to all concerned.

Plaintiff has gone so far as to assert that, independent of actual or constructive notice, the proceedings thus far were defective unless every congregation in Greater New York be shown to have participated in them, either by its rabbi or through a lay representative duly authorized for the purpose. No reliable authority for such assertion is produced. To be sure, this court entertained some expert testimony to that general effect, but it broke down under cross-examination, either because detached from its context or contrary to the weight of evidence or both. Certainly present day jurisprudence would regard the imposition of any such obligation as incompatible with the practical administration of justice.

Plaintiff has emphasized the failure of the United Rabbinate itself to appoint the court which drew up and adopted the *issur*, but has failed to indicate any provision of the Jewish law compelling it. Final judgment was rendered, not by the *Beth Din* of twenty-three, which in effect was an intermediate adviser, but by the whole body of rabbis present when the vote of the United Rabbinate was taken. The court received no testimony in the sense of hearing outside witnesses because not required to do so.

Too much attention has perhaps been given to the matter of testimony and other specific evidence before this committee or court, too little to a situation which amounted to an agreed statement of facts, so that the presentation of proof was relatively unimportant. As a result, of course, the chief function of the *Beth Din* became that of law-finding rather than fact-finding.

Under the Jewish authorities we discover nothing to prevent members of the court from being judges and witnesses also, and like the other tribunal of the United Rabbinate, it could apparently accept hearsay evidence. There were no parties to the proceedings we are now engaged in scrutinizing and, therefore, bias or prepossession, assuming any were found, was no bar to sitting in judgment. There is already seen to exist a great and fundamental difference between the trial of a religious question and the litigation of a controversy between man and man. Impartial, as between what he deems right and what he deems wrong, a pious Jew could scarcely be in the former case; *ex hypothesi*, he must take sides.[7]

This Supreme Court has before it no evidence that up to the date of the *issur* the plaintiff was a party to the proceedings or singled out in any way for personal attack. It was a defendant only in the sense that during the conduct of a public religious cause like this every member of the community, including the rabbis themselves, was deemed worthy of criticism because such conditions had been so long permitted to obtain.

The law of the Jews, like most laws, presupposes a judge free from sordid motives connected with the case. Possibly a few members of the two principal tribunals which passed upon the main question had unworthy individual motives, but that is far from discrediting either body. Here again must always be borne in mind the distinction, already referred to, between the purely religious and the personal types of trial. Besides, motive is a very difficult matter to analyze and weigh. Every rabbi is potentially a judge. Like any other human being, in order to live and function, he needs food, clothing and shelter and, therefore, money, though supposed as a judge to disregard and even despise such considerations. It would be too much to expect him as a man to ignore a prospect (which, by the way, does not appear to have been fully realized)[8] of wider employment at better pay; and it would be quixotic to press such a point against his qualifications as a judge. To do so would be senselessly to impugn the motives of all rabbis and impair their dignity. The absurdity of attempting to impose any such narrow standard or test appeared upon the trial before this Supreme Court in listening to the testimony of the learned clergy. Will any one venture to say that the plaintiff's experts showed more disinterestedness than those called by defendant?

No serious flaw, then, appears in the procedure so far, and we turn to the formal and substantial regularity of the decree itself.

The plaintiff's witnesses asserted that this is the first *issur* promulgated within the memory of living man, but its counsel brought out on the cross-examination of one of defendant's witnesses what looks like inconsistent evidence. Recourse at great length was had to the earlier authorities. It would be fruitless to give these citations *pro* and *con*, and the court contents itself with finding that the plaintiff, upon whom the burden of proof rested, has been unable to show that the document in suit was irregular in form. The best view appears to be that while *issurim* are usually found to have been ultimately reduced to writing, that fact is attributable to the advisability of identifying and perpetuating an important oral proclamation. So regarded, the writing, and the verification by signature of witnesses, become matters of proof, technically superfluous if, as here, other proof is available.

In substance, the *issur*, after reciting the facts found, the principles maintained and the conclusions reached, forbids the faithful from selling or buying poultry not slaughtered and sealed in accordance with its terms, prohibits *schochtim*, under penalty of disqualification, from participating in *schechita* of any kind unless agreeably to the *issur*, urges rabbis to conform, nullifies the rulings of non-conformers, and proclaims them rebel sons. These provisions, and particularly the ones which can be classified as bans, are strongly attacked. The answer in each instance is substantially the same — that the duty of rabbis to safeguard or hedge the faith, and thus *schechita* has never been questioned; that even confiscation,[9] and thus any lesser penalty, including what has, in the form of a (later) fixed price for the seal of one cent, been characterized as a tax, is authorized when found necessary in the course of providing such safeguard; that the permanence and seeming finality of the prohibition and the ban are justified by similar necessity and have precedents behind them; that previous opportunity was given all to conform; that some did conform in advance and those who did not, as for example the *schochtim*, and the plaintiff itself, had later opportunity to acquiesce as evidenced by the agreements they signed. The plaintiff's authorities as to the right of repentan e do not apply. There is testimony in addition to the effect that even now, were the United Rabbinate or the *Beth Din* to be convinced that an error or injustice had been committed, an appeal for reconsideration is still in order.

Perhaps the participation of the defendant in the preliminary proceedings and its appointment (in the *issur*) as secular agent of the United Rabbinate and the court for enforcing the edict require brief separate attention. Is it proper under the Jewish law to name

such a secular agent, and especially this non-religious corporation, as the arm of a religious body? The defendant's witnesses say yes, if justified by necessity, and that this necessity has been established. The plaintiff has not established the contrary and so fails on this point.

More than fourteen months have passed since the *issur* was proclaimed to New York Jewry as the law of the community. A relatively small proportion of the rabbis have placed themselves in opposition meantime but none of them rose on October twenty-ninth to register dissent, though some may have left the room. Even plaintiff's chief expert witness actively participated in the ceremony on November fifth. Solemnly garbed for the purpose he convoked the assemblage in his own synagogue and offered opening prayer for the success of the venture. True, considerable difference of opinion was from the first expressed as to the wisdom and policy of enforcing the seal requirement, but no evidence has been offered that in October or November, 1934, the least objection was made by any responsible person to the *regularity of the procedure adopted* or the *validity of the decree*. I conclude that the technical objections interposed for the present trial are afterthoughts. On the whole case I hold that the result was at the time acquiesced in, and it seems to have been approved to the present day by a consensus of lay and clerical opinion. This result is entirely consistent with the view of Samuel, the son of Mayer, and 150 other rabbis of early days, cited by plaintiff, in decreeing that rabbis should not ban " unless by the consent of the community."

One point remains for consideration: the claim of monopoly by the defendant. One who enters the field of the kosher trade assumes certain obligations, not usual in other lines; so much is admitted by the plaintiff, who concedes that supervision by rabbis is a prerequisite and is firmly established in New York law, having been enacted into our Penal Law (§§ 435, 435-a, 435-b). Kosher poultry costs more than non-kosher. It would be inequitable to permit its sale by any one as kosher unless in truth kosher. Whether it is so or not is a religious matter for the rabbis to determine. An overwhelming majority of them support the *issur*. The plaintiff cannot obtain the advantages of his business without assuming the disadvantages which necessarily accompany it. In the very nature of things, *kashruth* must be a monopoly in the hands of those best qualified to administer it. By definition and tradition those persons are the rabbis and their decree is final. Such is the effect of the evidence in this case.

Unless flagrant and obvious violation of Jewish law is shown, this Supreme Court will not go behind it.

" In all cases of doubt, when there is not clearly an absence of

jurisdiction, the decisions of church judicatories as to their own jurisdiction in ecclesiastical matters should receive great weight." (*Connitt* v. *Reformed Protestant Dutch Church of N. Prospect*, 54 N. Y. 551, 561.)

The law of this State is that: " The courts at no time assume to dictate or to interpret ecclesiastical doctrine, and such matters, whether discretionary or mandatory, are left to the ecclesiastical bodies. The court will not review the exercise of any discretion on the part of a superior church nor inquire whether its judgment or that of a subordinate is justified by the truth of a case. It will only inquire whether the organization's officer or tribunal has the power to act, not whether he or it is acting rightly." (*Harlem Church, etc.*, v. *Greater N. Y. Corp., etc.*, 145 Misc. 508, 511; revd. on other grounds, 245 App. Div. 292; modfd. by the Court of Appeals, 269 N. Y. 18.)

This is equally applicable to infringement of property rights. *Baxter* v. *McDonnell* (155 N. Y. 83) states: " Judge BRADLEY, in the court below, conceded that the plaintiff was bound by the determination of that tribunal so far as related to the matter of discipline and ecclesiastical rules, laws and customs of church government; and when rights of property are dependent upon the questions of doctrine, discipline or church government, the civil court will treat the determination made in the highest tribunal within the church as controlling." (See, also, opinion of RUGG, C. J., in *Cohen* v. *Silver*, 277 Mass. 230.)

Plaintiff feels itself aggrieved in its civil rights by the fraud, constraint and duress said to have been exercised by defendant corporation. It must fail by virtue of the principles of equity prevailing in this Supreme Court, to which it applies for relief. What basis is there for a claim of damages? There was no fraud for the reasons already discussed under the head of bias (see footnote 8). There is no duress unless it be first established that defendant arrogated to itself rights which it did not possess, whereas I have held it to possess full rights to do all it attempted. Had there been but one organization instead of two, all the acts complained of would clearly be the result of steps taken by a religious body. That the rabbinate saw fit to administer enforcement and collect funds through a membership corporation does not change the situation. On the contrary, it shows a laudable purpose of separating the spiritual from the mundane, a laudable willingness to subject its business affairs to visitation by the State courts. The Kashruth Association, Inc., being empowered in its charter to enforce compliance with the New York law by prosecuting offenders against the so-called kosher laws, cannot, says the plaintiff, attempt to apply compulsion by any other means. This does not follow.

To begin with, by deliberately making the earlier agreement with the defendant, then repudiating it, the S. S. & B. Live Poultry Corporation placed itself in an inconsistent position. Since it does not here defend an action for breach of contract brought by the Kashruth Association, rescission may not avail, the very history of the matter demonstrating the weakness of the plea. The S. S. & B. Live Poultry Corporation is dependent upon the principle of *kashruth* for the success of its business. It has defied defendant on the ground that the latter had violated the Jewish law in applying the principle at plaintiff's expense. As this Supreme Court has refused to recognize that claim and found defendant's acts done in accordance with the Jewish law, it must further hold the plaintiff entitled to no relief whatever. The answer to plaintiff's complaint of injustice is that there is no injustice. If plaintiff does not like the result of having disagreed with the views of the orthodox Jews there remain the plain alternatives of either once more complying or abandoning the field of kosher poultry sales.

There is another reason for denying the plaintiff relief. Its last rebuttal witness testified that the association of market men, of which plaintiff's president and chief lay witness is a director, have already taken the matter into its own hands and determined to proceed as it sees fit, discarding the *issur* and disregarding the United Rabbinate. Their plan provides for independent supervision, for which they have retained seven rabbis, of whom four as experts testified for the plaintiff. This court is asked to overturn an *issur*, carefully prepared, duly authorized and valid in substance and form, and give the stamp of approval to one of the very persons who organized what is at best their own method of accomplishing the same end. Equity will not come to their assistance by indirection, will give no affirmative relief, and leaves them where it finds them.

We have heard the procedure characterized as a revolution in Jewish practice through the adoption and use of divers means, including secular ones, to a religious end; the abandonment, at least for the occasion, of a congregational for a diocesan organization, and of an individualistic for a collective method of supervision and enforcement. Suffice it to say that this is the business of the orthodox Jews, not of the people of the State of New York. Weighty considerations of policy have been argued, as, for example, the difficulties and dangers attendant upon prohibition, supported by penalties, of acts in themselves harmless, such as the purchase and sale of food killed and handled in accordance with the dietary law, unless it bears the defendant's sale. Enough to reply that this court may not examine such questions, which are matters for the orthodox Jew to settle for himself according to his own law and his own judgment. The people of this State and Nation have made

many experiments upon matters vital to our very existence, and may freely continue to do so whenever that is not forbidden by our fundamental laws. We should be indignant were any official, without showing such a constitutional barrier, to deny us the right to make mistakes while pursuing our favorite practice of trial and error. Of course, a similar privilege belongs to all religious bodies within their province, and not least to the Jews, whose polity is democratic as well as theocratic. We have no right to consider even whether the tribunals concerned gave too much attention to the evils found and the need of reform, too little to a statesmanlike consideration of the wisdom of the means to be adopted. If perchance the rabbinate have unwittingly imposed upon the laity burdens too heavy to be borne, they will find it out, and may indeed be assisted by facts elicited upon this trial and not previously known.

The court regrets the failure of an attempt to effect a settlement, continued for several days, and the necessity, after a long and bitter struggle between the parties, of awarding victory without peace.

Judgment for defendant. Settle findings and decree accordingly.

---

[1] For the purposes of this case an orthodox Jew has, on consent, been defined as " one who, from religious conviction, insists on kosher killing of poultry." An expert called by the court, with the approval of counsel, stated that the number of those who buy kosher-killed poultry (he would not pass on their convictions) was 1,250,000 to 1,500,000 in New York city.

[2] With the help of God, Monday, the 27th day of the month of Mar Cheschvan, 5695 (November 5, 1934).

Whereas, in the City of New York, there is, as is generally known, chaos in the matter of slaughtering of poultry for Jewish consumption, and

Whereas, in many poultry slaughtering establishments and markets, there are manifold malpractices, in violation of the laws of the Torah, concerning " nevelah " and " trefah " (two classes of non-kosher food), and especially since investigations recently conducted have made it abundantly clear that the structure of Kashruth regarding poultry has collapsed, as was demonstrated by the facts brought out in these many investigations, which show how far Kashruth in the slaughtering of poultry has been defective and imperfect, thus casting upon such slaughtered poultry the suspicion of their being forbidden under the Biblical dietary laws (a situation which we deeply deplore) and

Whereas, as rabbis, official guardians of our holy religion and the correct observance of its precepts, the laws of our sacred Torah place upon us specifically the responsibility of taking the necessary measures to keep our people from the consumption of forbidden food (and if at this juncture we should remain silent and inactive, we would be guilty of a serious breach of religious duty);

Therefore, in view of the situation here set forth and the duty devolving upon us, we have reached the following decisions:

(1) That the slaughter houses and the Schochtim must be placed under permanent and effective supervision, as approved by, and under the auspices of, the rabbis of the City of Greater New York, who are united in the Kashruth Association.

(2) That each bird slaughtered as kosher must be marked with a " plumba " or a similar sign, such mark to be affixed by a person authorized by the rabbinate, as an identifying token of Kashruth and evidence that the bird has been slaughtered as kosher in accordance with the traditional laws and regulations so that our coreligionists in New York City by purchasing only poultry which come from such slaughtering establishments as are under the proper supervision above described and which bear authorized tokens of Kashruth will be safeguarded from violation of the dietary laws.

(3) And, therefore, in accordance with the authority specifically vested in us by the holy Torah, for safeguarding the observance of its dietary laws, we herewith do, with the full strength and severity of the law, solemnly declare, pronounce,

issue and publish an issur (religious prohibition), to go into effect forthwith on poultry not slaughtered in accordance with the above regulations or not bearing an authorized token, as above described, declaring that such poultry is forbidden to be consumed by Jews. Utensils in which birds not killed in accordance with these regulations have been cooked may not be further used without previous inquiry of a rabbi, who shall determine whether they may be used again.

(4) And every Schochet who, in contravention of these regulations, will slaughter birds without supervision or without a token of Kashruth being affixed, as described above (unless the slaughtering is done in each case by express permission of a qualified rabbi for the use of sick people), will lose his status of reliability in regard to Kashruth, and as a violator of the Jewish Law will henceforth become disqualified to act as Schochet.

We cherish confidence that no rabbi or scholar versed in Jewish Law will attempt to diminish the force of this prohibition or rule to the contrary, and thus rebel against and separate himself from the entire body of the Orthodox Rabbinate of New York City in which case his ruling shall become null and void as are the rulings of one who is a destroyer of the fence of the law (non-conformist).

May the Grace of the God Almighty rest upon us, and may peace and prosperity come to all our brethren in the House of Israel who conscientiously observe the laws of our holy faith. The blessings of the good God be ever upon them.

[3] For the purposes of this case an orthodox rabbi has, on consent, been defined as " One whose religious learning, character and fitness in other respects to act as such, are proven by certificate from (a) an internationally recognized orthodox rabbinical seminary, or from (b) an orthodox rabbi whose repute for piety, learning and rabbinic authority is generally recognized." It was stipulated that there are about 300 in New York city.

[4] Code of Rambam (Maimonides) Laws of Sanhedrin, chap. 26, last section.

[5] Rambam (Maimonides) Guide to the Perplexed, part III, chap. 35.

[6] See Leviticus, chap. XI, 44-45, and commentary of Sifra thereon: " I (saith the Lord) delivered you from the land of Egypt in order that you might accept the yoke of these dietary laws * * *." (Inasmuch as these regulations, except as interpreted in the issur, are unquestioned, detailed citations from the Jewish authorities relating to them are omitted.)

[7] Talmud Pirke Aboth. chap. 1, par. 1. " Make safeguards around the law." See, also, R. Travers Herford, Pirke Aboth (1925) p. 21. " The rabbi was enjoined not to make followers of himself, but to impart to all whom he could influence such knowledge as he possessed of divine truth. To make a hedge for the Torah is a famous phrase * * *, the ' hedge ' consisted of warnings whereby a man was saved before it was too late from transgression." (Schulchan Aruch Choshen Mishpat, chap. 2, § 1.)

Rambam, Laws of Rebels, chap. 2, § 4. * * * " A Beth Din which sought to strengthen the faith and build a hedge in order that men might not transgress the Torah, may smite and punish even though not in strict accordance with the law * * * and so if they saw fit to nullify a commandment for a short time, in order to bring the multitudes back to the faith, or to save many Israelites from stumbling, they may do what the emergency requires, just as the doctor amputates the hand or foot of a person in order that he may live, so the Beth Din * * *."

Schulchan Aruch Pissche T'Schuvo, Commentary on Even Ha'Ezer, p. 64, " In the matter of issurim the court receives evidence not in the presence of the defendant, for it is advantageous for him to be saved from the issur. So wrote Rad Baz in his Responsa (Part 1, par. 70), and he gave a reason for his words: that where one is to be saved from an issur, the entire world is a party."

[8] The following concessions were placed in the record: The live poultry business has an annual turnover of about $42,000,000. The annual gross sales of plumbas (seals) is about $200,000. The seals cost the defendant one dollar and thirty cents per thousand, and are sold for ten dollars per thousand. The rabbis (about 180) receive about five dollars to seven dollars and fifty cents per week for their supervision in connection with defendant. The plumberers (generally maschgichim or supervisors) receive about twelve dollars per week. The schochtim are supposed to receive about fifty dollars per week, fixed by labor contracts. Defendant's overhead is about $18,000 per year. The Bronx is one of the two greatest centers of Orthodox Jewish population, and thus of kosher poultry consumption. (These concessions also serve to answer plaintiff's claim of fraud, later discussed.)

[9] Rambam Laws of Sanhedrin, chap. 24, § 6. " And so a Judge may confiscate money (which is the property of private citizens) and may take it away and give it away, as he sees fit, in order to repair the breach in the faith and strengthen it."